United States May it please the Court, Alan Horwitz for the Plaintiff's Appellants. This dispute has a long and complex history. Let's try to cut to the chase here. I understand your argument to be that we've got a pot of money here, which is agreed to an amount, and the only question is how to allocate the deductions between the abandonment issue and the rap right. Correct? Also, for some of the transactions, there were two branching rights, so they also have to be allocated, for example, between the Illinois branching right and the Texas branching right and the rap right. But basically your argument is there's a pot of money here, and even if we didn't do a good job in giving the value of one or the other, we at least ought to get the benefit of the minimum deduction that would exist under those circumstances because everything is either attributable to the rap right or the branching right. Correct? Correct. Is that undisputed, that there's one pot, and we all agree that it is attributable to either of those two, and so you're entitled. It's just a matter of whether we allocate it, and maybe the amount is higher or lower if it's a branch right or a rap right. That was the issue before the trial court. The trial court made findings as to what the amount was that was paid for FISLIC assistance. Now, I think what you're referring to is that in this court the government has tried to make a new argument that some of that amount should also be allocated to something called goodwill, which they don't really define, and there are a lot of problems with that argument. It wasn't really made by the government below. It's inconsistent with the court's findings because the court found that this amount is to be allocated to the FISLIC assistance. If there was the kind of goodwill they're talking about. No, but I think you're mistaken. There's an agreement that it's allocable to the FISLIC assistance, but there was FISLIC assistance that went beyond these two things. That's your problem, and this chart that you have on page 8 of your blue brief, the citations don't support the chart. You do have testimony from your expert witness that said that some of the FISLIC assistance that he attributed the minimum value to, the forbearance, they attributed minimum value to the forbearance, and that's, of course, the only way that you can get to this two-item pot is to say that the other FISLIC assistance doesn't have any value. No, no, I'm sorry. Wait, wait. Or that I've established what the value is and made the deductions that are reflected in this table on page 8. Right. That's correct. The second statement that you made is correct. I mean, the amounts of the values of the FISLIC assistance or the other FISLIC assistance in some of these transactions is not in dispute. You said the forbearance is valueless, so I'm not going to attribute anything to it. No one disputed the values that are attributed to those. No one admitted it, right? Excuse me? No one admitted that this table is correct. Well, I have to disagree. I think that when you put together all these values. Could you show me where the government admitted that this table is correct? Well, we cited to the pages in the Court of Appeals. I looked at those pages. They don't say that. Well, let me say this, Judge Dyke. Rather than get down in the weeds of that, I believe those things are established. But let's take the Missouri-Florida transactions, which is one of the transactions at stake. There is no other FISLIC assistance in that transaction, and there are no deductions that are made. So this is the exact number that comes from the same table in the trial court's opinion. So as to that transaction, your objection is not pertinent to that particular transaction. So you can't affirm based on that because of that transaction. The problem that I see is that we really don't have any findings of fact by the trial court that this table is correct. That the amount listed here is attributable to these two items. The trial court found what the purchase price was for the FISLIC assistance. Yeah, but the FISLIC assistance, that's the problem. Not the two things, but the FISLIC assistance. And there were other items of FISLIC assistance aside from the two, right? Not in the Missouri-Florida transaction.  What about the others? The others, there was other FISLIC assistance, like below-cost financing, and that was valued. And it's not disputed, I don't think. I don't see anywhere in the government's brief where they're disputing that. What they are trying to dispute, as far as the point about the two different rights, is the point that I thought Chief Judge Gross was alluding to, which is this idea of goodwill. And that, I think... And are you saying they never raised that before the lower court, the goodwill? They made an argument, a different argument. I mean, in the trial court, they said there's no traditional goodwill. They admitted that. They made an argument that there was something out there relating to two lines in one of their expert reports. And the expert report basically said, you know, we don't think that the branching rights were worth as much as Holmes says they were. So they must have been paying for something else, and let's call it goodwill. And that, I would say, was rejected by the court in attaching these amounts to the FISLIC assistance. So what the government is trying to argue here is that you always have some kind of residual goodwill, that the way you should do this calculation is to just figure out what the values are, the actual assets that we know about, and then just attribute all the rest of it to goodwill, even if it turns out to be $200 million or something like that. Is the goodwill FISLIC assistance? No, goodwill is not FISLIC assistance. I mean, these are three-corner transactions. Holmes got some things from the institutions that it was acquiring, you know, all the obvious assets. And these things that are more goodwill-like, those were things that came from the institutions. And then they got some things from FISLIC, which is what they were after. That was like the branching rights and the rep right, which is kind of, you know, a tail, but it was required in order to advance with these. Because that was the incentive to take over institutions that had more liabilities than assets, right? Yeah, they were taking over institutions that had more liabilities than assets. That's what FISLIC needed. They needed to get rid of these institutions, and as a carrot to get these larger banks to take them over, they offered them the right to branch into other states. It was not permitted under current law at the time. And that's resolved already from the collateral estoppel from the Ninth Circuit, that this was the price that Holmes paid for the branching rights was the excess of the liabilities over the assets. But your problem with the Ninth Circuit decision is also to recall that it said that the branching rights hadn't ripened into a deduction because they hadn't been abandoned. And the government, I guess, made that same argument in this case, but it wasn't resolved by the Court of Federal Claims. Isn't that correct? That's correct. There's an argument by the government that the rights were not abandoned in a taxable year, and that was not reached by the Court of Federal Claims, so that would be open on remand. So if the Court of Federal Claims were to say, well, no, there wasn't an abandonment deduction because it hadn't ripened, then your two-item box theory, if I can call it that, wouldn't work. No, no, it doesn't change the allocation. I mean, the allocation is how much of the cost basis, how much was paid. Yeah, but the point is... We would not get the abandonment deduction. No, no, no. No, your problem is this, that your argument, and it seems to me it has some potential merit to it, is that if the amount of the pot is agreed to, and if it's agreed that the amount of the pot reflects only these two deductions, then however badly we did in presenting expert testimony as to the value of the individual items, we at least ought to get the minimum deduction that would occur if you attributed all of the rights to one thing or the other, right? No, our main argument is... The argument that you're describing is that the trial court made a finding that it could not find a value for the wrap right, and then it said that because of that I wouldn't even have to look at the branching rights. You're not going to get anything for the branching rights, no matter what. And then it went on to look at the branching rights. And we've said that that part of it was wrong, that a failure to prove the value of the wrap right would not automatically bar us from the branching rights deductions. But that's a very subsidiary point. We started out in your argument, and I asked you whether your argument, or at least one of your arguments, was that it's agreed that a certain amount of money is attributable to these two rights. And even if we didn't show how much value should be attributed to one or the other, we should at least get the minimum deduction as a result of that. That's one of your arguments, right? That wouldn't be a fallback argument, but that is not the primary argument. I'm trying to deal with that argument. So if, in fact, you weren't entitled to the abandonment deduction, then that argument wouldn't work, right? To me, you're conflating two things, which is whether there's a cost basis of these rights, and then whether we get a deduction for it. But under the two-item box theory, it could be that all the value is attributable to the branching rights, and if the branching rights weren't abandoned, then there couldn't be a deduction for the branching rights. There couldn't be a deduction, but there would be a cost basis in the branching rights. This case was about allocating the cost basis. And I know it's a little confusing because the assets are so unusual. That's why we tried to give the example. This kind of allocation issue comes up all the time in a lot of contexts. That's why we tried to give the example of someone who buys a house and a lot together, and you have to allocate the purchase price between the two assets, or Hank Aaron's bat and cap, none of which the government has responded to. You can see, though, that it's your burden to establish what value goes to which rights, right? That's right. And what the court said was that Mr. Grabowski's methodology wasn't sufficient to do that. And is it your position- I disagree. I'm sorry. I mean, you disagree that the court said that, or you disagree that- I disagree that the court said that. What the court said repeatedly was that Plano's fair market value determinations are not reliable. The way that Mr. Grabowski, his conclusions on how the cost basis should be allocated, the court did not agree with. And the main reason for that the court gave was that the court thought that the deposit growth projections that he used in his model were too optimistic. But the court did not find that his model was unsound or couldn't be adjusted to produce a different allocation. From a basic economic perspective, if you use the wrong assumptions, then the end result is flawed. And that's what the court said. The assumptions that were made were based on a totally different time frame, a totally different set of circumstances. And so those assumptions were no good. So is it your position that the court then has an obligation to readjust the assumptions and do the economic valuation? Yes, absolutely. Even if you don't, when it's your burden. Excuse me? Even if you didn't adjust the assumptions, and it's your burden. I mean, what I'm trying to understand is it's one thing to come in and say, these are our assumptions, and this is what we really think the answer should be. But you didn't say, but even if you think that that assumption is too aggressive, then we have an alternative valuation that we could offer. You didn't do that. Of course we did that. Mr. Grabowski showed these sensitivity analyses, which showed how the results were different, if you made different assumptions. But only relating to a two-year time frame. Right. How could he guess every single thing that the court might possibly choose to change? I mean, these economic models, which is considered the best way to value these kind of intangible assets, they have a lot of inputs. There's a lot of assumptions. No one's going to agree exactly on how everyone should be done. But there was a ton of evidence in the record. Even if you disagreed, even if you thought they were too optimistic, there were plenty of other numbers in the record the court had taken directly. You already knew at this point that at least one district court thought that those assumptions were too optimistic. Well, the Western District of Washington, I mean, the facts were different. There was a different model. You said that his analyses and model changed from one court to the next, but I don't really see you pointing to what those changes were. Well, he did some things differently, but, you know, I would say the general approach was similar. Right. I mean, that's what your brief said. He did some things differently, but you didn't say what. Right. I mean, they have to be material differences, right? No, they're not material differences. The question is a burden of proof here, and there's no collateral stoppable effect if that's what you're suggesting. I'm not suggesting that. I'm saying you already knew that at least one finder of fact thought that your methodology was flawed. So why not come in to the second finder of fact and say, even if you, like that other district court judge, would not accept this methodology, there are alternative ways to approach the calculation? I have strongly disagreed with the premise of that question, Judge O'Malley. There was not a problem with the methodology. There was a problem with a particular input, a particular assumption that Mr. Grabowski made about what the deposit growth projections would be. The court there in Western District of Washington and the court here, and, by the way, we didn't have the Western District of Washington opinion when this report was submitted here. They thought the deposit growth projections were too optimistic, although, in fact, the deposit growth projections were quite consistent with the other evidence in the record from the SEC letter, from Holmes' own projections at the time, from what other things were going on in the industry. I think the court didn't really understand that the growth that the court observed here was attributable to inflation, and that, in fact, deposits, even under Mr. Grabowski's view, went down during this period in inflation-adjusted terms. But, in any case, that's not what the appeal is about, about whether his projections are right or not. The trial court should have approached this issue the way this court's predecessor did in the Meredith Broadcasting case, the way the Capitol Blue Cross court did in a case that involved an economic model. You don't have to accept the expert's opinion. Those cases are different. You have the Court of Federal Claims finding a fundamental problem with your expert's testimony, and you're saying that the Court of Federal Claims had an obligation to cobble together an alternative theory for you. I don't see the cases that support that. Again, I'm sorry I have to disagree with the premise of that question. The Court of Federal Claims found no fundamental problem with what was done here with the modeling. The Court of Federal Claims said that the input you put in here for deposit growth is too high, in my opinion, because I think the market conditions call for a lower deposit growth projection. So what you do is you substitute a different input, a lower deposit growth projection, which he even showed how that could be done in his testimony, and there is nothing in the Court of Federal Claims' opinion that suggested that the court ever considered doing this. He presented all kinds of ranges. No, no, no, no. Did he say, okay, if my numbers are wrong here, as the government says they are, then this is the adjustment you should make and this is the number you come out with? He said if my numbers are wrong. Did he say that? That this is the number you should come out with? How could he possibly say that? Did he present a specific alternative approach? Alternative approach? No. Alternative numbers? He has all kinds of explanations of how you can put in alternative numbers. That's the only way to do it. How could he possibly guess what exact number the Court of Federal Claims would think is a better deposit growth projection? Is it 33.7% of what he used? It's impossible for him to do that. It's very easy for him to do that if the Court of Federal Claims had done what it should have done and made findings. I find that deposit growth projections are too optimistic. I find that they should be 40% lower. That's almost exactly what the Court did in the Meredith case, which is controlling precedent here. So I'm halfway done. We'll restore some of that from the other side. Thank you. Good morning. May I praise the Court, Andy Weiner, for the United States? Suppose you had a situation where there's an agreed amount of cost and it should be allocated to one deduction or the other, and the taxpayer does a terrible job in presenting the allocation between the two. Shouldn't the Court, under those circumstances, at least say, well, since you've done a bad job in describing the allocation, we'll assume the least favorable allocation to the taxpayer and we'll allow a deduction on that basis, if that were the case. Shouldn't that happen? Your Honor, respectfully, I would say no. But that comes back to the fundamental burden as to the fact that the taxpayer has to come with sufficient evidence for a reasonable allocation. Well, why should the answer to my hypothetical be no? What? Why should the answer to my hypothetical be no? The answer, because the – well, if you look to, like, for example, this case, the allocation has to do with two different types of deductions that happen both – impact as to the amount of the deductions and for what year. Right. So I'm saying why not – I guess the wrapped deduction would be less valuable than the abandonment deduction. Well – So if they do – if they can't allocate between the two, why shouldn't the Court say, okay, there's no basis for an allocation here, but I'm going to give the taxpayer the least favorable outcome here, which is attributable – which is to attribute everything to the wrapped deduction and allow the deduction on that basis. Well, to address your example first, and then I'll back up to the concept, the – you had pointed out, I believe, in my colleague's opening argument, that the answer could be he gets nothing, that home should get nothing or finance should get nothing, because as you said, right, not only do you have to prove that there's some allocation of cost basis to the branching right, but you also have to say that the branching right has been abandoned and – No, no, I understand that. Yeah. I'm putting that aside in my hypothetical argument. Okay. Okay? Okay. I'm saying it's admitted that there are two deductions available here, and the only question is how much goes to one and how much goes to the other. Right. Under those circumstances, if the taxpayer doesn't prove the right allocation, shouldn't the court say, okay, you didn't prove the right allocation, so we're going to put it in the least favorable box and we'll attribute it all to the wrapped deduction and you get the deduction on that basis? On that hypothetical, isn't that what the court should do? Again, I respectfully say no, and I believe that the Ninth Circuit addressed this. They said that, look, this is not about what, you know, what the – what equitably should be done. This is – the standard is very well established and has been established for a century, that the idea is you have to prove that you're entitled to a refund, and you have to prove in what amount. You don't have to prove the valuation to the dollar. You do have to come up with reasonable evidence for which a court could make a reasonable allocation between two items, whether it's two – But you agree there was some – there was value to these rights, correct? There was some cost basis value. There was something, yes. Right. So there's something. So normally what you would see, or what you would expect to see, is the taxpayer comes in and says this is the way we think they should be valued, and the government would say that's not a reasonable valuation because we think other factors need to be taken into consideration, and we would propose an alternative valuation. Instead, you've got a situation where your argument is the government can just stand quietly and never offer anything and say, ha-ha, what you got wasn't quite right, so therefore you get zero. Your Honor, this is an example in which the government, as again my colleague said during the opening argument, these are very unusual, these are very unusual intangible property. They are property that are specific to the home's business and business model. They obviously have a much better insight as to what that value is. What they tried to do in this case was to hit an absolute home run and to say notwithstanding the realities, the interest rates were at 16%, the fact that the industry was collectively in a massive crisis and that Congress was passing legislation and agencies were conducting massive triage through these verdicts. And the government was begging entities like this to come in and help solve the problem. Right, but the reality of it is that notwithstanding the crisis that the industry was in, they decided they were going to put on an expert evaluation that assumed the rosiest of rosy projections, projections that exceeded, well exceeded even what the home had said to the SEC, which was in fact not an actual, that was not an evaluation, that was just trying to justify how they were going to allocate goodwill. But even those projections were 40% less than what their expert came in and did four years later. We now know with the benefit of hindsight, looking at what they actually did in these other states, they had over, they had, Grabowski had projected $5 billion more of deposits than what they actually received. It was fanciful. But why couldn't the calculation have been done based on what they actually received? Well, to that point, because they came in and they said, look, we're going to assume that interest rates are going to stay sky high and yet we're going to create, we're going to assume that home is going to flourish in these various other states and that they're going to capture a lot of market share, that they're going to basically reproduce what they did under ideal situations and circumstances a decade earlier. I agree with the fact that the ideal circumstances were, you know, as I said, it was the garbage in input. Your assumptions, if your assumptions are wrong, then your ultimate result is usually wrong. But why couldn't there have been other assumptions, even assumptions based on the actual facts, as you just pointed out? Because the valuation, because plaintiff's valuation kind of put the court in a, put the court. They didn't present an alternative scenario. Right. They put the court in a box. It would be one thing to say, look, if we assume the treasury, that the interest rates are going to stay sky high, this is what our evaluation is. If it goes higher, this is what our evaluation is. If it goes lower, this would be our evaluation. That would be at least a step in the right direction. What they did is they said. Your argument is kind of acts like it's sort of has this ring of being punitive. I mean, you said here, you gave us some details. The 16 was a bad number because. That begs the question, and if you had a better number, why can't you just plug in different numbers? Because, Your Honor, I understand that plaintiffs here are trying to say, why don't you just plug in different numbers? But if you are saying that the assumptions of the model, that the model operates on, are in fact incorrect, then just plugging in different numbers is not actually doing anything to improve the accuracy of that model. Well, if you change the assumptions. You're saying that the plaintiff had an obligation to sort of, or the taxpayer had an obligation to argue against itself. To say, well, this is what we really think we'd be entitled to, but if you don't like that, we'll try this one. And if you don't like that, we'll try this one. I mean, that puts the taxpayer in a very difficult posture, does it not? Respectfully, no. It requires that they come in with a valuation that bears reasonable resemblance to accuracy and to the realities that were on the ground. If you are trying to come up with a number that is as high as possible, and so therefore you make all these unreasonable assumptions, then your model is not going to withstand scrutiny. But why couldn't the government have had some obligation to say, the more reasonable assumptions are X, Y, or Z? Because, Your Honor, well, this does get back to the fundamental point that taxpayers come in with the burden of being able to prove a reasonable valuation. And the government can't be put on that burden to come in with a competing valuation on all cases because it doesn't know what the value of these things are, and those values could be remarkably low. Well, the government put these packages together and begged them to take them, right? Correct. So wouldn't the government have some sense of how it put the package together in order to make it sweet enough for people to be willing to take them? Well, I think the reality is that Home was in a situation that they were looking, they were staring into the abyss as well, as was everybody in that industry at that time. And Home decided that they were going to make a bet because they were playing with house money. FISLIC didn't make the kind of analysis that we're talking about now here, right? I'm sorry? FISLIC didn't make this kind of analysis when they gave the regulatory assistance? Well, certainly they announced the regulatory assistance with the idea that they had to come up. They didn't try to value the abandonment right or the wrap right. Right. That wasn't, that was, yeah. No, that, excuse me, Your Honor, that was obviously not what FISLIC was doing. FISLIC was trying to figure out, well, what's an inducement for these people and for healthy thrifts to come in and acquire thrifts that are insolvent? And the other thing was, what are the hurdles? The wrap right, for example, addresses a hurdle. The healthy thrifts couldn't take on the insolvent ones because that would, for almost across the board, that would have meant that through the merger, that they would have failed in meeting their capital requirements. So they would have been technically under FISLIC's domain if that had happened. So you have this wrap right where you get to basically count the portion at which the acquired thrift is insolvent towards the capital requirements so they don't blow their capital requirements by engaging in these mergers. So that's really what FISLIC was interested in doing was to facilitate this triage of the industry. Okay, could I bring you back to this table on payday? And let's assume for the moment that under my hypothetical, that if you only had two items and all the costs were attributable to the two items, that the taxpayer would get at least the minimum amount that would be yielded by putting the deduction into one box or the other. And let's put aside the idea that the abandonment deduction wasn't available at all, which would destroy my hypothetical. But let's assume I have that. Do you agree that the numbers in this table on page eight are correct, or do you disagree with that? To be honest, Your Honor, I would have to go back and look. That was not our focus. We agree with your basic approach that, look, this isn't just a binary allocation. We, of course, focused on this idea that they were acquiring businesses and they could have had a significant residual. And so, therefore, they would only be entitled to the fair market value of each right, not an allocation of a pot of money as between two. But you're right. The additional assistance would reduce that pot of money that they would then allocate to the two. But there's an important point here. The important point is this, is that they're saying, look, we've got $200 million in which these thrifts were insolvent, and we say that that should go to either the branching rights or the wrap rights. If they are saying that there can be no residual, which is what the government had argued below, then that means if the fair market value of the branching rights was $100 and the fair market value of the wrap rights was $200, that's only $300. That's not close to $200 million. What they want to do is they want to basically just gross it up. They want to say, well, if it's $100, $200. You want to allocate all the value to the two things that are deductible. And you stipulated to the value of the FISLIC assistance, as I understand it, but that's not necessarily a stipulation that the FISLIC assistance was limited to these two items. There were other items. And the question is if value is attributable to those other items, which is in dispute, then we don't have a situation where we have a number and we know it's attributable to these two things. No, Your Honor. We did not stipulate to the value of the FISLIC assistance. We said that the value of the FISLIC assistance is basically the purchase price, which is the liabilities assumed, minus the assets. And minus the assets that they assumed. And that delta would be the FISLIC assistance. But we didn't actually stipulate to hard numbers. Was there a dispute as to the liabilities and assets and what that yielded? No dispute as to the liabilities. The assets, we say, would include intangible goodwill or whatever reason. How much goodwill, though, did these entities that were effectively insolvent have? Certainly, again, there's no dispute that they were insolvent. There is, however, the fact that they have thousands, if not tens of thousands of customers. They've got lots of deposits. They've got reputations within the state. But did the government proffer a number that should be attached to that goodwill? No. I mean, that's the unique quality of goodwill and going concern value is that it's the residual. It's not an independent valuation from the business. It comes along with the business and, therefore, it is what you cannot – it's the purchase price that you can't ascribe to other – Do you agree that in the Missouri-Florida transaction that the only FISLIC benefit, other than perhaps this residual goodwill, were the wrap rights and the branching rights? Honestly, Your Honor, I'd have to go back and check the record because there was – again, there was some guaranteed support. There was some below – as my colleague had said, there was some below market financing. The FISLIC also added as part of the assistance package. And I'm not entirely positive off the top of my head. I'd have to go back and check to see whether there was anything. But, again, here the court said, even assuming all of that stuff – I'm sorry. My time is over. Go ahead. Even assuming – I apologize. Even assuming all that stuff, the court said, look, we're going to take all your assumptions with respect to the idea that you've got this pot that needs to be allocated between two things. But the thing is that you haven't met your burden as to establish even a reasonable – with respect to those two things. And that has a huge consequence as to what benefit you have. It could be zero, again, if they did not, as they found in the Ninth Circuit. If the branching rights weren't abandoned, they would get nothing for that regardless of the value. So if you allocated all the money in the branching rights. Okay. Just two quick questions. Do you agree with your friend on the other side that this issue of goodwill was not pressed before the lower court? No, I disagree with that. And it's a new issue here? I disagree with that. In fact, in their reply brief, they do a reasonable job. They missed one additional place in which we'd argued it. But they do a reasonable job of laying out exactly in our pretrial brief with respect to their burden of proof. We had said, look, there is a goodwill residual here that you're not factoring into your analysis. I want to be clear about this goodwill. If I understand correctly, the goodwill is not physical assistance, but you say it bears on the value of the assets. Yes. And in order to determine the cost that we're dealing with here, you have to take into account goodwill and valuing the assets. And that they have not done that, right? Yes. So there is a nomenclature confusion here. There is supervisory goodwill, which is that component that the wrap right says that you're allowed to attribute that to your regulatory capital requirements. And then there's this idea of part of their purchase of these strips was this residual goodwill that they had in their communities. Which is an asset. Which is an asset. And anytime you acquire a business, you're not just acquiring a bunch of property. You're acquiring. But at that point in time, everybody was running away from these savings. True. The notion that there's much goodwill is kind of hard for me to stomach. True. But the thing, I mean, again, this is a bit of a sideshow based on how the court addressed it. But the idea being that, look, it's a component. There are other components. The idea that this is just a binary allocation is, I think, an inaccurate representation as to what this trial was really about. But in addition to that, Desmond Management does say that, look, a company does not have to be profitable. A business does not have to be profitable to have goodwill. In fact, lots of them don't. The idea is that you're purchasing an expectation. I mean, startups, you could acquire startups. Again, that's very different than the circumstances. You're saying we should have really looked at the circumstances on the ground. And what I'm saying is you're not looking at the circumstances on the ground. It's one thing to buy a startup. It's quite another to buy a failing company in a failing industry that everyone was running away from. Correct. And so it's possible that then your expectation then would be that there would be a relatively small amount that would be allocated to goodwill. But my point is only this. My point is that it does mean that you still have to take it into account. And their assumption, their argument, we should get something for the equities. We've identified a number that could be attributed to the cost basis of two things, so we should get something. Our response to that is, look, it's not just two things. And let me just – the last thing, and this is the one point that I – the second point I wanted to get to, which is the Bowery transaction. Now, you've got the 1985 where you agree that there's a set cost basis, right? Yes. And that you argue that the 1988 transaction meant that it was an entirely new transaction. And you cite cases that are, I think, materially different because there you're talking about a totally different asset. And I look at this bucket of incentives from FISLIC in 1985, and all they do is move around a little in 1988. In other words, some of the incentives go away, but then some of them get sweeter. So I have a very hard time saying that those two transactions were sufficiently materially different that the 1985 package and its cost basis isn't reflective of the 1988 cost basis. So I think the proper way to analyze this, Your Honor, is to say, look, there is absolutely no question that there was an exchange here. Because the fact of the matter is it's not just the amortization period of the one wrap right compared to the other wrap right that changed, which in and of itself would probably be sufficient. But the entire methodology of how you determine what the goodwill component that is subject to the wrap right is completely different because the situations on the ground have changed. Home decided, or Amundsen, really, Home's parent, wanted to change, wanted to exchange the wrap rights because they knew that under the old methodology they would probably get nothing. So they negotiated a different methodology so that they would be able to book some goodwill, which ended up being $183 million as opposed to $600 million. These weren't materially different assets like they were in the Supreme Court case upon which you brought up. No, it's potentially savings. Look, even if you had exchanged shares in a company that had reincorporated in a different state and so you exchange your old shares in the old state for the new shares in the new state, that's an exchange. Then the question becomes whether it's a like-kind exchange. And then you have to look to, well, is their economic situation equivalent, both before and after the exchange? Did the court do an analysis on that like-kind? I mean, the court said it's not a like-kind, but just simply because the assets were different. Rather than saying, let's look at the package and does the package essentially put them in the same place, but just with different types of incentives? Well, I think that the court, again, it was at the very end. It is, again, I think the last paragraph of the opinion. But I think the court did enough to say that, well, I know the court lays out the standard of a like-kind exchange, says that there has to be some material difference in kind or in nature. Kind is not the right word, but it lays out the standard and says, look, in my determination that, and I think this is entirely correct, not just because of the amortization period, but because they completely changed. Remember, the Wrapright from 1985 was about reversing a mark-to-market purchase accounting adjustment. And the Wrapright in 1988 is just looking at the liabilities acquired over the identifiable assets and booking that difference as goodwill. That's a completely different methodology by which you define goodwill, which is the value of that right. And so there is no reasonable way, I think, that you could get to the fact that this was a like-kind in seeing that their economic situation was equivalent both before and after. Unless there are any other questions, we would ask the court to confirm. Thank you. On the residual goodwill, let me just say I think we should at this point rely on the reply brief, which addresses this in detail. As well, I would ask the court, this was briefed at great length in the special burden of proof briefing in the trial court where we showed that the law does not support any idea of residual goodwill here because, A, you have to have some extrinsic evidence that there actually is goodwill. And as Judge O'Malley pointed out and as the record here shows, there wasn't any such thing. And second, you can't have this idea of a residual unless the other assets that are involved can be valued pretty accurately. Did your witness testify that there was no residual goodwill? Did our witness testify? Yes. Our witness went through at great length all the different things that could be goodwill here. He valued some of them, like the core deposit intangible and what he called assemblage and the fact that there was already a workforce. Those are things that are called goodwill. And then he said things like going concern value, they don't exist here because, you know, the southern federal trademark wasn't worth anything. They came in and they ripped down those signs and nobody was going because of these old failed savings and loans. They were going and they put up home signs. So this is addressed in detail in the record. And anyway, the court's findings, I think, are to the contrary. But what I really want to talk about is this idea that our witness, we tried to do a home run with these valuations. It's completely not true. There's no dispute that home paid these hundreds of millions of dollars for these assets. That gives them a cost basis. I mean, the fair market valuation that was done here only makes marginal difference in what the deductions are going to be. It really doesn't make the sensitivity analysis show this. It doesn't really make that much difference whether the branching rights valuations are pushed up or not. It does make some difference at the margin. But there was no effort to do that. And you can see that, I think, in two areas. One is the government's expert testified about what he thought were reasonable ranges for these inputs, the deposit growth projections as well. And for the most part, Mr. Grabowski's estimates came right within the range of the government experts. They were in line and they were in line with the things that were thought contemporaneously in the SEC letter. The second thing I'd point to is that the court also found that Mr. Grabowski had overvalued the wrap rate. Well, that actually redounded to our detriment, overvaluing the wrap rate. I mean, we had the cost basis. The cost basis is what was actually paid. There was no dispute about that. And we just came in with this economic model and tried to give the court the best assistance that we could in coming up with an allocation. And in a way, it's an example of this idea that no good deed goes unpunished. Because you don't need an economic model to actually do valuing or to do an allocation. We were just looking at relative values here. I mean, the court could have allocated just by looking, say, between the states, just by looking at the cost. You lost this argument in the Ninth Circuit, right? You lost this argument in the Ninth Circuit. Which argument? The argument that you're just making. You lost the argument that you're just making in the Ninth Circuit. That we weren't trying to make a home run? I don't understand what you're projecting. Your argument that the Court of Federal Claims here and the district court there should have come up with an alternative valuation. Well, in the Ninth Circuit, the court found that there were fundamental flaws in the model. It recognized that the model could be cured there. Some of these things, like the deposit growth projections, could be cured by coming up with different inputs. And that's what this court has said in Meredith and in Capital Blue Cross. But they said there were other problems. There were fundamental flaws in the model by pointing to other difficulties. The district court in Washington found a lot of difficulties with the model there that were not found by the Court of Federal Claims here. I don't think you're responding to my question. You argued in the Ninth Circuit that even if the model that we presented was flawed, that the district court had an obligation to come up with a number anyway, right? Yes. We lost that, right? The Ninth Circuit held that the model was, based on the district court's findings in that case, that the model was too flawed to be able to do that. That is not a holding that's transferable to this case. And I don't think there's any – the Ninth Circuit, I don't think, disagreed that there's generally an obligation to come up with an alternative valuation. It's the task of the fact finder to come up with a valuation, not to try to kick the case out on a burden of proof. I do think it's important for the court to think about the breadth of this issue and not confine it to the particular fact situation here. I mean, this case and the case from the Ninth Circuit is an invitation to the government not to submit its own valuation, an invitation not to settle these disputes, which normally don't end up in court, and it's going to be a tremendous burden on courts. I guess you could look at it as an invitation that you should present a model that works. Yes, well, we presented a model that worked, and there was no dispute about that, I don't think, that the model was sound and that if you put in different inputs, you would get a different answer. Thank you. We thank both sides, and the case is submitted.